Filed 7/14/21  C.G. v. Superior Court CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

|  |  |
|---|---|
| C.G. et al.,<br><br>    Petitioners,<br><br>        v.<br><br>THE SUPERIOR COURT OF ORANGE COUNTY,<br><br>    Respondent;<br><br>ORANGE COUNTY SOCIAL SERVICES AGENCY et al.,<br><br>    Real Parties in Interest. | G060161<br><br>(Super. Ct. Nos. 19DP1577, 19DP1578)<br><br>O P I N I O N |

Original proceedings; petitions for a writ of mandate to challenge an order of the Superior Court of Orange County, Antony C. Ufland, Judge.  Petitions denied.

Martin Schwarz, Public Defender, Seth Bank, Assistant Public Defender, and Brian Okamoto, Deputy Public Defender, for Petitioner C.G.

Donna P. Chirco, under appointment by the Court of Appeal, for Petitioner J.A.

No appearance for Respondent.

Leon J. Page, County Counsel, and Karen L. Christensen, Deputy County Counsel, for Real Party in Interest Orange County Social Services Agency.

Law Office of Harold LaFlamme and Hannah Gardner for Real Parties in Interest the Minors.

\*         \*         \*

## INTRODUCTION

J.A. (Mother) is the mother, and C.G. (Father) is the father, of B.G. and M.G., who were taken into protective custody in December 2019 after M.G. tested positive for methadone. Mother and Father each brought a petition for writ of mandate to seek relief from the juvenile court's order, made at the 12-month review hearing, terminating reunification services and setting a hearing pursuant to Welfare and Institutions Code section 366.26 as to both children (further code references are to the Welfare and Institutions Code unless otherwise noted). The section 366.26 hearing is set for July 20, 2021.

Both Mother and Father argue they were not offered reasonable reunification services because they were prevented from using their full amount of visitation time with M.G. Father also argues he was not offered reasonable services because he was never given a referral to an inpatient substance abuse treatment program that would provide the higher level of care he needed due to his methadone regimen. We conclude substantial evidence supports the juvenile court's finding that Mother and Father were offered reasonable services and, therefore, the court did not err by terminating reunification services. We also conclude the juvenile court did not err by declining to continue dependency proceedings: Substantial evidence supports the finding there was no substantial probability that M.G. and B.G. could be returned safely to Mother and Father's physical custody by the 18-month milestone. Both writ petitions are denied.

2

## FACTS

### I. Events Leading to Detention of M.G. and B.G.

Mother gave birth to M.G. in December 2019. M.G. was born at 32 weeks and weighed 4.08 pounds. M.G.'s preliminary urine screen tested positive for methadone.

Mother tested positive for methamphetamine and methadone. She had been on a methadone regimen for seven years after detoxing from heroin. She admitted that she was struggling with methamphetamine addiction, used methamphetamine during her pregnancy, and had used methamphetamine on the day she went to the hospital to give birth. Mother also admitted that she had received no prenatal care. Father also had a history of using heroin and methamphetamine and had used methamphetamine on the day Mother went to the hospital.

B.G., who was then eight years old, was temporarily staying full time with S.G., a close family friend. S.G. was willing to provide B.G. continued care if he were removed from Mother and Father's custody.

Mother was cooperative and spoke freely with the social worker. Mother said that she and Father were not married to each other but had been together for over ten years. Mother was married to Y.A., but had had no contact with him for years. Mother said that she had worked in the beauty industry and as a bartender until she became pregnant with B.G. Father had been let go from his job in June 2019. The family is supported by public assistance and had been staying in hotels because they could not pay rent for their apartment.

Father too was cooperative and spoke freely with the social worker. He confirmed that neither he nor Mother was currently working. Father was a tattoo artist (both Mother and Father are heavily tattooed) and once had his own tattoo shop. Father used heroin in about 1999-2000 and then was clean for five years. Father used

3

methamphetamine, but it was not a "daily thing" and he and Mother never used drugs in front of B.G.

## II. Petition and Detention

On December 17, 2019, a protective custody warrant was issued to remove M.G. and B.G. from Mother and Father's custody. Two days later, Orange County Social Services Agency (SSA) filed a juvenile dependency petition alleging failure to protect (§ 300, subd. (b)(1)) and no provision for support (§ 300, subd. (g)).

As relevant to these proceedings, the dependency petition alleged as the basis for the claim of failure to protect: (1) When M.G. was born, Mother tested positive for methamphetamine and methadone, M.G. tested positive for methadone, and M.G. suffered from withdrawal symptoms; (2) Mother had an unresolved substance abuse problem that included the use of methamphetamine, heroin, and cocaine; (3) Mother had participated in methadone treatment for the prior seven years; (4) Father had an unresolved substance abuse problem that included the use of methamphetamine and heroin; (5) Father participated in methadone treatment; (6) Mother and Father had a history of not being forthcoming about their substance abuse and during a prior child abuse investigation had denied using drugs; (7) Mother and Father do not have a safe and stable residence for M.G. and B.G. and had been staying in hotels or with friends after losing their apartment; and (8) Mother and Father had a history of anger management issues.

At the detention hearing on December 20, 2019, the juvenile court found Father to be the presumed parent of M.G. and B.G., ordered that M.G. and B.G. be detained, and ordered reunification services for Mother and Father. Mother and Father were granted a minimum of 10 hours per week of supervised visitation with both M.G. and B.G.

M.G. remained in the neonatal intensive care unit of Children's Hospital of Orange County. In early January 2020, the assigned social worker met with Mother and

4

Father together at M.G.'s bedside and reviewed the allegations of the dependency petition with them. Mother confirmed that she has used methamphetamine since 2017 and her last use was on December 10, 2019. Mother reported using heroin in the past but has been using methadone regularly since 2013.

Father confirmed he had used heroin in the past and was on a methadone regimen, although he was not compliant with his methadone prescription when he spoke with the social worker. Father confirmed he uses methamphetamine but said it was not his "cup of tea." He denied that he or Mother had an anger management problem and confirmed that the family was transient.

Both Mother and Father expressed a desire to reunify with M.G. and B.G. B.G. recognized his parents and S.G. as important people in his life. B.G. told the social worker that he felt "kind of sad" after a visit from Mother and Father because he "want[s] to spend more time with them." B.G. seemed to be happy with his caregivers and displayed no behavioral or emotional problems.

M.G. was discharged from the hospital on January 7, 2020 and placed in a foster home. He had not shown further symptoms of drug withdrawal and had no developmental issues. Mother visited M.G. on January 9 and appeared to be attentive to his needs.

On December 27, 2019, the assigned social worker gave Mother a packet of referrals for drug testing, outpatient and inpatient substance abuse treatment, self-help meetings, counseling, housing, and parent education. Mother agreed to give Father his packet of referrals. Father was given the same referrals as Mother.

Mother had her first drug test on December 31, 2019. She tested positive for methadone on that date and on January 4, 9, 11, and 13, 2020. As of January 21, she had a call-in rate of 85 percent. As of January 14, 2020, Mother was not enrolled in a parenting program but was scheduled to begin outpatient substance abuse treatment on January 25, 2020 at Twin Town Treatment Center (Twin Town).

5

As of January 13, 2020, Father was not compliant with drug testing. He had "no shows" for December 31, 2019, and January 6 and 7, 2020 and had a call-in rate of only 56 percent. Father preferred to drug test by means of a patch, and both Mother and Father were referred for patch testing. On January 21, 2020, Father informed the social worker that he had his first patch placed on him. Father also told the social worker he was working on establishing a "sober support network" for his family and had been calling a detox facility to request an available bed. Father said that, in the meantime, he would begin outpatient treatment at Twin Town.

### III. Jurisdictional Hearing

The jurisdictional hearing was conducted on January 21 and 28, 2020. The juvenile court excluded Y.A. as a father of M.G. and B.G. for all purposes, dismissed the allegations under section 300, subdivision (g), ordered the petition amended by interlineation, and found the allegations of the amended petition to be true by a preponderance of the evidence. The matter was set for a contested dispositional hearing on February 25, 2020.

On February 13, 2020, Mother attended an intake appointment with the Orange County Health Care Agency Anaheim Substance Abuse Disorder Program. Mother continued to participate in patch testing. She was scheduled to begin individual counseling on February 18, 2020. Mother told the social worker she was attending self-help meetings but had not supplied attendance cards.

Father had been accepted into a substance abuse treatment program at Woodglen Recovery Junction (Woodglen) for substance abuse treatment and was scheduled to begin on January 28, 2020. Father had a drug patch applied on January 20, 2020, but he did not return within ten days to have it removed and tested. Father appeared on January 31, 2020 to have his patch reapplied. He said he was in a detoxification program and therefore, could not have his patch removed. Father reported

6

attending self-help meetings but did not supply his attendance cards, and had not started individual counseling.

### IV. Disposition Hearing and Case Plan

The disposition hearing was conducted on February 25, 2020. The juvenile court declared M.G. and B.G. to be dependent children, vested custody with SSA, and found that continued placement was necessary and appropriate. The court found that progress made by Mother and Father toward alleviating or mitigating the causes necessitating placement had been minimal. The court approved the case plan and visitation plan proposed by SSA.

The case plan required Mother and Father to complete a drug treatment program and to submit to random drug and alcohol testing. All drug tests had to be negative for drugs, and a missed test or a diluted test would be considered a positive test. The case plan required Mother and Father to "refrain from the use of drugs" and to participate in Narcotics Anonymous/Alcoholics Anonymous and provide proof of attendance. Mother and Father were required to complete a parenting class and to participate in individual, conjoint, family, and/or group therapy "until such time as the assigned social worker determines in consultation with the therapist that the goals of therapy have been accomplished and therapy is no longer necessary." The case plan authorized three weekly, in-person, supervised visits with a total of 10 hours weekly of supervised visitation, which the assigned social worker would facilitate.

### V. First Reunification Period:
### February 25–August 24, 2020

Mother's and Father's participation in reunification services and their visitation with M.G. and B.G. for the period February 25 through August 24, 2020 were reported by the assigned social worker, Kristin Matthews, in a Status Review Report dated August 24, 2020 and an addendum report of the same date.

B.G. remained placed with S.G., and M.G. had been placed with the maternal uncle and his family (the K.'s), who lived in San Bernardino County. Mother and Father waived objection to the out-of-county placement. Both M.G. and B.G. were thriving and seemed more "joyful" since being placed.

B.G. was very attached to Mother and Father and worried about them a great deal. B.G. liked the frequent telephone calls from Mother and Father. Matthews reported that B.G. "suffers greatly due to his parents' drug dependence, transient lifestyle, and undependability. The parents do not seem to take full responsibility for B.G.'s struggles, they mostly seem to blame the Court's involvement for [B.G.]'s sadness."

Mother and Father acknowledged receiving the packet of referrals to complete their case plan. They lived on the streets and continued to use drugs up until at least the middle of May 2020. Both Mother and Father wanted to reunite as a family.

Mother attended a perinatal program until it closed due to the COVID-19 pandemic. Matthews referred Mother to online self-help meetings. Mother continued to receive her daily methadone dose and some counseling. On May 15, 2020, Mother sent Matthews a text message stating that Mother intended to start a residential drug treatment program, Clean Path, where she could stay for 30 to 120 days. Mother enrolled in Clean Path and was due to complete the inpatient portion of the program by late August 2020. The treatment provider and Mother's case manager believed outpatient treatment also was necessary. Mother's first few drug tests were positive for methadone, amphetamine, and methamphetamine. In August 2020, Mother's drug tests at Clean Path were positive for only methadone.

At Clean Path, Mother participated in programs for substance abuse/relapse prevention planning, anger management, communication skills, psycho-educational groups/mental health education, parenting and life skills, cognitive behavioral therapy, and trauma and attachment. Mother was described as "a cooperative and enthusiastic participant."

8

On August 13, 2020, Matthews learned that Mother wanted to leave the Clean Path inpatient treatment program against the advice of her clinical treatment team. Mother had completed 90 days of the program, and, when advised she should stay for another 30 days, she became argumentative and angry, walked out of treatment meetings, and would not participate in her therapy sessions.

Mother left Clean Path on August 15, 2020. Her discharge plan document stated: "The client ended up leaving treatment on 90 days despite clinical team recommendations. The reported reason for the client's wanting to leave was, wanting to gain employment in order to get permanent housing assistance through Mercy[] house in order for her and her boyfriend to regain custody of their children. . . [Mother] refused linkages to step[-]down programs and was not transitioned to another program." On August 19, 2020, when Mother informed Matthews of leaving Clean Path, Matthews sent her referrals for drug testing.

At Clean Path, it had been recommended to Mother that she "titrate down" (lower) her daily high dose of methadone. She disagreed with that recommendation and declined to work toward lowering her methadone intake. According to Matthews, "that choice also hampered her options for ongoing treatment and aftercare options that may have allowed placement of one or both of the boys with her."

Father had not drug tested or completed a drug treatment program. He was provided referrals for inpatient and outpatient programs in December 2019, and May and June 2020. Father had been referred to drug testing in December 2019; he called in 11 times by January 13, 2020, but did not show up for the four requested tests. Father told Matthews that he would not participate in reunification services; he maintained that position until June 2020.

On June 11, 2020, Father informed Matthews by text message that he had enrolled in Woodglen but would have to wait 90 days, as he had previously been "unsuccessful" there. Father informed Matthews that he had not entered a program

9

because most programs would require him to go off methadone or lower his daily dosage to 30 milligrams

In July 2020, Matthews received confirmation that Father had been placed on a waiting list for a residential drug treatment program at Twin Town. Father would be eligible for outpatient services until a place became available for him there. On August 12, 2020, Father told Matthews by text message that he had obtained employment as a tattoo artist, bought a new car, and anticipated receiving money in settlement of a lawsuit.

Father entered the program at Twin Town in August 2020. He tested positive for amphetamine on August 3 and negative on August 17. Twin Town suggested that SSA test Father more often, so Matthews submitted a drug testing referral for him.

Due to the COVID-19 pandemic, many visits with M.G. and B.G. were conducted virtually. Because B.G. had his own cell phone, Mother and Father were able to communicate with him throughout the day. While Mother was at Clean Path in Orange County, the K.'s drove from San Bernardino County to pick up Mother and take her to visits with M.G. After the visits, the K.'s drove Mother back to Clean Path. The K.'s did this to demonstrate their support for Mother's recovery. The addendum report states: "This transporting of a parent was far above and beyond what is reasonably expected of a caretaker; the undersigned has asked [Mother] to 'brainstorm' how she will now handle the transportation and visitation arrangements now that she has left treatment (against the advice of the treatment professionals) and is without restriction of travel. [Mother], in her reply text, did not address the issue of her transportation but did suggest that visits with [M.G.] continue to happen at a park as the baby 'does well outdoors.'"

Matthews recommended continuation of reunification services. She initially concluded that Mother was much further along in her recovery than Father and, once separated from Father and life on the streets, had developed "greater clarity" about the importance of sobriety. But after Mother left Clean Path, Matthews became concerned that Mother's sobriety "may be in jeopardy." Matthews was "heartened" by

10

Father's employment: She believed Father to have "remarkable" talent as a tattoo artist and hoped his talent would be a "healthy outlet" that would serve to keep him focused on becoming stable. Matthews was concerned over the decision by both Mother and Father not to try to lower their methadone intake.

On August 24, 2020, at the six-month review hearing, the juvenile court found that Mother and Father had received reasonable services and ordered continued services. Mother's progress was deemed "moderate," while Father's was deemed "none." The case plan included goals of staying sober, cooperating with services, obtaining a stable and safe residence, following the visitation plan, informing the social worker of any difficulties in completing the case plan, staying free from illegal drugs, demonstrating the ability to live free from drug dependency, complying with all required drug tests, and attending 12-step meetings. The services offered included general counseling, parenting education, outpatient substance abuse treatment, substance abuse testing, and 12-step meetings.

## VI. Second Reunification Period: August 25, 2020–April 21, 2021

A. *General Impressions; Living Situations*

Mother's and Father's participation in reunification services and their visitation with M.G. and B.G. for the period August 25, 2020 through April 21, 2021 were reported by social worker Matthews in the January 28, 2021 Status Review Report and three addendum reports dated, respectively, January 28, 2021, March 11, 2021, and April 16, 2021.

M.G. continued to be placed with the K.'s; B.G. continued to be placed with S.G. Both M.G. and B.G. were thriving. M.G. was "very loved" by the K.'s. Matthews described B.G.'s placement with S.G. as "loving" and praised Mother and Father for carefully choosing a "safe and stable home" for B.G. when their lives were becoming "disruptive and unsafe" for him.

11

The January 28, 2021 Status Review Report had many positive things to say about Mother and Father. Mother and Father had maintained positive relationships with their sons, and Matthews was impressed with "the community" that Mother and Father had created in the lives of M.G. and B.G. Mother and Father were "an intact couple," "loving people," "remarkably devoted to each other," and "attached to their children." Father had an "amazing creative talent" as a tattoo artist.

Mother and Father had a history of "long periods of sobriety and high functioning." But they also had a history of drug abuse and instability, and, unfortunately, "this period of supervision happens to be one of those periods where [Mother] and [Father] have struggled with maintaining a drug-free lifestyle."

As of January 28, 2021, Mother and Father were living in a motel room in Fullerton at a location conveniently close to their methadone clinic. Father had over 20 years of experience in lighting in the motion picture industry but was overdue in paying union dues. The maternal uncle had repeatedly offered to pay Father's union dues and to provide job leads. Father had not accepted those offers. Mother and Father acknowledged they were not stable enough at the time to care for M.G. and B.G. Father, whom Matthews described as "insightful and remorseful," stated he knew he and Mother could get sober, but not during that period of court involvement.

By April 16, 2021, the whereabouts of Mother and Father were unknown. Mail to their old address was being returned to SSA.

B. *Drug Testing and Substance Abuse Treatment*

Mother did not meaningfully engage in services after leaving Clean Path. She tested positive for methamphetamine on August 21, 2020, six days after she left Clean Path and reunited with Father. Mother had a 94 percent call-in compliance rate from August through November 30, 2020, a 72 percent call-in compliance rate from December 1, 2020 through January 22, 2021, and a zero percent call-in compliance rate from January 29 through March 11, 2021. She did not appear for tests on December 28

12

and 29, 2020, and January 6, 21, and 29, and February 1, 3, 9, and 18, 2021. She drug tested 26 times and, as would be expected, she tested positive for methadone in all tests. Mother tested positive for methamphetamine on August 21 and December 11, 2020 and tested positive for morphine and opiates on September 8 and 28, and October 5, 2020. Between September 17 and December 11, 2020 she had nine positive tests for benzodiazepine. Mother also did not provide proof of attendance at 12-step meetings.

Matthews provided Father the drug testing information and phone number four times—August 21, September 15, September 29, and December 4, 2020. Father did not appear for any required tests from December 2019 to December 2020. From December 1, 2020 to January 22, 2021, Father's call-in compliance rate was 40 percent. He failed to appear for six out of eight required tests. Father tested positive for methamphetamine and benzodiazepine on December 10 and 18, 2020. Father also failed to provide proof of participation in a 12-step program.

Father drug tested in July 2020, September 2020, and October 2020 for his three enrollments at Twin Town. Father had several tests that were positive for methamphetamine. Father was discharged from Twin Town for failure to attend or failure to follow through on the higher level of care for which he had been referred due to his high methadone dosage.

Father had received resources and referrals to counseling at the beginning of the period of supervision and in text and e-mails thereafter. He left treatment and did not request additional counseling referrals. In December 2020, Father completed the parenting education component of his case plan.

After January 28, 2021, both Mother and Father ceased drug testing and stopped calling in to check if a drug test was scheduled. Father sent Matthews another e-mail message on March 25, 2021 to inform her that he had begun a methadone detoxification program, was enrolled in an intensive outpatient program at Twin Town, and was on a waitlist for inpatient treatment at Phoenix House. He also wrote that he had

13

called in for drug testing.  Matthews was unaware of Father's enrollment or participation in any aspect of his case plan.

C. *Visitation*

Mother and Father had frequent and regular contacts with B.G.  These contacts included twice-weekly visits at a park, day-long outings, and visits and meals at S.G.'s home.  Mother and Father had "unfettered access" to B.G. by calling his cell phone, and B.G. often spoke with them many times each day.  "This is a strong and attached unit of [B.G.] and his parents."  S.G. was committed to Mother and Father's "healthy involvement" in B.G.'s life.

Because M.G. had been placed outside of Orange County (with Mother's and Father's consent), "flexibility in visitation ha[d] been authorized and exercised." Mother and Father had authorization to arrange visitation with M.G. as was convenient for them and the K.'s.  In August and September 2020 Mother and Father had three in-person visits with M.G.  Mother and Father attended a birthday party for B.G. in October.  Many family members were there, and Mother and Father were able to spend time with both M.G. and B.G.  Mother and Father visited M.G. at the K.'s home once in October 2020 and again in December 2020 for a party to celebrate M.G.'s first birthday.

In the January 28, 2021 Status Review Report, Matthews described the family as "loyal" and noted that "[t]he parents and these boys are very fortunate to be surrounded by supportive and caring friends and family."

In late December 2020 and early January 2021, in-person visits were affected by COVID-19.  On January 20, 2021, Matthews sent Mother a text message asking, "Are you guys ok??"  Mother responded with a long, caustic reply.  Mother wrote that she was not "ok" because she was "in the middle of dealing with the biggest heartbreak of my life.  LOSING MY BABIES."  Mother told Matthews:  "You don't know what it feels cuz you decide what you 'think is best' although it may not be!" Mother went on a rant about the benefits of children being raised by biological parents,

14

lack of visitation during the pandemic, and alleged injuries M.G. suffered at the hands of his initial foster parents. Mother accused Matthews of having planned from the outset to take M.G. and B.G. away from her and place them with their caregivers. Mother claimed there had been a lack of communication and "so I just stopped communicating with you all together [*sic*]." Mother also claimed she had been promised reunification and had done everything her case plan required, and even had gone so far as to break up with Father, which she had not wanted to do.

Matthews responded with a text message acknowledging it was the "Dumbest Question Ever" to ask if Mother was ok. Matthews also acknowledged that Mother was correct about a lot of things, most of all that Matthews did not know how it felt to have children removed from the home. Matthews explained that she was worried about Mother and Father because Mother had stopped calling in to test and Father had had a positive test.

On February 4, 2021, a visit with M.G. at a park was arranged for the next day. Mother and Father did not confirm the visit and canceled it when the K.'s were already at the park with M.G. Mr. K. volunteered to transport M.G. to Orange County the next day for a visit, and Mother and Father agreed to meet. Mother and Father did not inform Mr. K. of their availability so the visit did not take place. Mother and Father could not be reached by telephone because, as Mother later explained, their telephones had been off since the previous Friday. Another visit with M.G. in Orange County was arranged; Mother was 30 minutes late, but the visit was positive. The K.'s sent Mother and Father photographs and video recordings of M.G. whenever they requested them.

On March 16, 2021, Father sent the K.'s and Matthews a text message requesting that all arrangements for visitation with M.G. be made only by e-mail rather than by direct contact with the K.'s. Everyone agreed. Two days later, Matthews sent Mother, Father, the K.'s, and others an e-mail stating that "all visits will need to be confirmed 24 hours in advance or the visit will not occur." Matthews imposed the

15

confirmation requirement due to misimpressions about visitation dates, canceled and missed visits, and late arrival at visits.

On March 23, 2021, Matthews received a nasty e-mail from Father, who wrote to complain about the 24-hour confirmation requirement: "This dirty little game you['re] playing is so juvenile [and] entry level. It is an enormous waste of all our time [and] supremely counter productive [*sic*] if we['re] attempting re-unification. Are you aware of this? If you are—that makes you a sadist. If you['re] not—you should be replaced []because it is both unprofessional []and getting us all no where [*sic*]—fast. [¶] . . . [¶] This whole[] 24 []hour notice rule—which is the new weapon—in your arsenal of destructive methods you use to disrupt, and dismantle our visitation plans to see our son—we find it un ammusing [*sic*] [] so knock it off bozo. Act your age [and] start conducting yourself like a professional. That['']s what we as tax payers are paying you for."

On March 24, 2021, Father sent Matthews an e-mail message thanking her and S.G. for facilitating "wonderfully splendid" visits with B.G. on March 22 and 24. That same day, Father sent Matthews an e-mail message accusing her of abusing her power by canceling a visit with M.G. because Mother and Father did not confirm at least 24 hours in advance. Father claimed the 24-hour confirmation rule had never been discussed or announced, Matthews was punishing him and Mother by canceling the visit, and the whole process was "a merry-go-round of deception and hypocrisy and hidden agendas" and a "bullshit-o-rama."

A supervised visit with M.G. on March 25, 2021 had been arranged. Matthews offered to supervise the visit. She drove in a county car to the K.'s home in San Bernardino County to pick up M.G., then drove to a park where Mother and Father awaited M.G.'s arrival. The visit lasted two hours 30 minutes and went well. Mother and Father were at all times respectful, cooperative, and pleasant. Matthews asked Mother and Father how they wanted to arrange future visits. Both Mother and Father

16

requested a return to the previous practice by which Mother and Father arranged visits by contacting the K.'s directly. When Matthews reminded Mother and Father that they had requested an end to that practice, Father confirmed that he preferred arranging visits personally with the K.'s.

M.G. fussed, cried, and squirmed when, at the end of the visit, Mother placed him in the car seat in the county car. Mother and Father became tearful and said "'this is the hardest part, saying goodbye.'" Mother and Father kissed M.G. goodbye and walked away crying. M.G. continued to cry and fuss when Matthews buckled him into the car seat, but he stopped crying when Matthews drove away and within one minute was silent. Matthews stopped the car and sent Mother and Father a text message notifying them that M.G. was quiet and content.

Later that day, Matthews received from Father a hostile e-mail stating: "[I] can't begin to imagine the horr[i]ble thoughts of our son wondering what he must have done to deserve this. Handed off from the warm loving hands of his parents to a cold social worker['']s patrol car complete with state CPS skins on the fucking door—this sweet amazing little boy was in wretched tears of agony clinging to his mommy and daddy wondering what he did wrong to deserve this after spending the happiest few hours he['']s probably had in a long time if not ever." Father then wrote of the "torture" and "agony" of having a social worker transport the child and claimed he had been opposed to the visit because Matthews would be involved.

Mother and Father had no contact with M.G., either virtually or in person, after the visit in the park on March 25, 2021. On April 8, 2021, Mother cancelled a visit with M.G. She told the K.'s that Father "is 'on one' right now", had "thrashed their hotel room trying to get" Mother "kicked out," poured lighter fluid on her clothes, and took off in their car. Father had threatened to call B.G. and tell him Mother was a drug addict who "filled M.G. with drugs."

17

D. *Conclusions and Recommendations*

In the January 28, 2021 Status Review Report and each addendum report, Matthews recommended termination of reunification services for both Mother and Father. The recommended permanent plan was legal guardianship for B.G. and adoption for M.G. Matthews wrote that Mother "is a loving, affectionate, insightful mother who unfortunately remains in the grip of addiction." Father is "a thoughtful and sensitive man" who is pained greatly by separation from M.G. and B.G. but "[u]nfortunately, his pain has not spurred him into action to become sober and to address the Case Plan that would have allowed the reunification of his family."

Matthews concluded that Mother and Father had not shown the capacity and ability to complete case plan objectives. "[Father]'s failure to meaningfully participate in most of the Case Plan left [Mother] with a choice; she states she knew she could either carry on in her sobriety alone and get the boys returned to her alone or she could return to her relationship with [Father]. [¶] [Mother] involved herself in growing healthier, sober, and stronger during her treatment, but she appears to have returned to the same level of addiction, sadness and instability that she had before her treatment. [Father] still has a long way to go in order to show he has recovered from addiction and is ready to be a full-time father." Although both Mother and Father were "loving people, attached to their children," both were "practicing addicts who are unwilling at this time to become fully sober or even titrate to a lower methadone dose."

## VII. 12-month Review Hearing

A contested 12-month review hearing was conducted on April 16, and 19 through 21, 2021. The January 28, 2021 Status Review Report and the three addendum reports were received into evidence. Matthews, Mother, and Father testified.

A. *Matthews's Testimony*

Matthews testified as follows:

18

Matthews was assigned the case in late February 2020. The service plan for Mother and Father included drug testing, drug/substance abuse treatment, parenting classes, and therapy. In addition, Mother and Father were to obtain a suitable residence and avoid arrests and other activities. Mother and Father were authorized nine hours of visitation per week for each child.

Neither M.G. nor B.G. could be returned to the care of Mother or Father. Matthews based this conclusion on their failure to call in for drug testing, participate in drug abuse treatment, be tested for drugs, and find stable and suitable housing. Matthews was concerned that both Mother and Father were using drugs other than methadone. Matthews did not know where Father was living and if Mother had stable and suitable housing.

During the first period of reunification services, Mother provided proof she had participated in "a great deal" of her case plan; however, during the second period of reunification services, Mother provided no proof she had participated in any services. Mother left Clean Path, where she had been in residential treatment, and returned to living with Father. Mother did not complete her outpatient treatment, often failed to call in to drug test, and tested positive for substances. Mother offered no explanation for the positive tests. Mother reported she had prescriptions for anxiety and depression, which would explain her positive test on December 11, 2020 for benzodiazepine, but would not explain her positive test for methamphetamine.

In November 2020, December 2020, and January 2021, Matthews gave Mother referrals for outpatient programs. Matthews sent the referrals by e-mail and text message to both Mother and Father.

Between March 11 and April 16, 2021, Mother submitted one drug test, the results of which had not been received. Although Mother's methadone level limits the places at which she can receive substance abuse treatment, Mother never told Matthews of having difficulty finding a program. Matthews became concerned that Mother and

19

Father had COVID-19 and so, in January 2021, sent Mother a text message asking, "Are you guys okay?"

Mother completed her parenting and counseling requirements during the first reunification period. Matthews did not tell Mother she needed to complete another parenting class. Matthews did send Mother referrals for additional counseling because it appeared she was still using drugs and was in "an unhealthy and potentially dangerous relationship." Matthews did not know whether Mother was participating in self-help meetings.

Mother did not regularly and consistently visit M.G. and used only an estimated one fourth of her authorized visits. Mother visited M.G. at the park, the beach, the mall, and the caretaker's home. Mother never told Matthews about any difficulty in arranging visits. At a visit on March 25, 2021, which Matthews supervised, Mother spoke of her difficulties with arranging transportation to visits. Matthews mailed Mother a bus pass and spoke with the K.'s about the transportation issues. The K.'s provided transportation for Mother and M.G. several times and gave Mother money for gas and a car. Mother never asked Matthews to arrange a halfway point for visits in order to make them easier to get to. Mother was regular in her visitation with B.G. and sometimes used all her nine hours weekly of authorized time.

Matthews denied ever telling Mother she could "kiss her baby good bye," as Mother claimed.

Matthews communicated with Father by telephone, computer, and in person. Her last in-person contact with Father, and the only in-person contact during the reporting period, was in March 2021. Before then, she did not have monthly in-person contacts with him.

The only information that Matthews had received regarding Father's case plan compliance was a certificate of completion of a parenting class. Matthews was not aware of any participation by Father in counseling since the current case plan was

adopted in August 2020. She had sent Father several referrals for outpatient and inpatient treatment, which included counseling.

Father's drug testing call-in compliance between March 11 and April 16, 2021 was seven percent, and he had not participated in drug testing since March 11, 2021. Matthews terminated the drug patch referral on November 13, 2020 because Father already had a referral for urine testing. She was not aware of Father's participation in Narcotics Anonymous or Alcoholics Anonymous meetings.

As of August 24, 2020, Father had enrolled in the Twin Town outpatient program "on and off several times." Twin Town provides outpatient services, counseling, testing, and relapse prevention after treatment is completed. In September 2020, Matthews spoke to a representative of Twin Town, who informed her that Father had been discharged after an initial assessment. In October of 2020, Matthews spoke to another representative of Twin Town, who confirmed that Father was enrolled and scheduled for an intake assessment. But on October 28, 2020, Matthews was informed that Father had been discharged from Twin Town for noncontact and because he needed a higher level of treatment with medical supervision due to his level of methadone intake. Some drug abuse treatment programs require patients to "titrate" to a less medically demanding level of methadone before they can be enrolled. Matthews did not have a "higher-level" referral she could have provided Father: Twin Town was her referral for higher care because it has "all the connections and all the referrals for medical treatment and with the higher level he needed." Matthews did not follow up to learn what referrals Twin Town had given Father and did not speak to anybody at Twin Town in December 2020 and January 2021. In February 2021, a representative of Twin Town left Matthews a message saying Father had been discharged from the program due to "non-contact and non-participation and non-compliance."

Sometime between August 21, 2020 and April 16, 2021, Father told Matthews that he had enrolled in Woodglen. Father also told Matthews that he had been

21

discharged from Woodglen for noncompliance and nonparticipation. Father did not tell her that he had been discharged because he could not get his methadone treatment there. On December 4, 2020 and January 20, 2021, Matthews spoke with Father about entering a residential drug treatment program. She knew that Father received his methadone at Western Pacific Medical Clinic, but was not aware of any other services he received there.

Father was neither regular nor consistent in his visitation with M.G. and had used 30 to 35 hours of visitation time out of 200 hours authorized. In September 2020, October 2020, December 2020, January 2021, February 2021, and March 2021, the visitation with M.G. was sometimes in person and other times virtual. In January 2021, visits were interrupted for reasons which included one caregiver contracting COVID-19. Some in-person visits were in San Bernardino and some were in Orange County. Matthews supervised a visit at a park on March 25, 2021; Father interacted "[p]ositively" with M.G. during the visit.

Matthews did not supervise visits between Father and B.G. between August 24, 2020 and April 16, 2021. B.G. told Matthews that he liked seeing and visiting his parents.

Mother and Father sometimes had an agreed-upon visitation schedule with M.G. At other times, Mother and Father were free to arrange with the K.'s visits as it was convenient for everyone. Mother and Father often had a regular visitation schedule with B.G. However, neither one used the full nine hours per weeks of visitation with B.G.

B. *Mother's Testimony*

Mother testified as follows:

While at Clean Path, Mother completed a parenting class and participated in counseling. Matthews told Mother that the counseling requirement was complete. After Mother left Clean Path, she immediately began looking for another program and

found Anaheim Behavioral Health, which offered an "intensive out-patient program." Mother started the program at Anaheim Behavioral Health in late September/early November 2020. She attended counseling and was drug tested twice a week. Mother stopped attending classes at Anaheim Behavioral Health because they were held on the same day as her visits with M.G. As a consequence, Mother was "dropped" from the program. At the time of the 12-month review, Mother was not participating in counseling.

Mother attended Alcoholics Anonymous online once or twice a week. Mother was beginning the fourth step of the 12-step program and claimed a sobriety date of June 28, 2020. Mother believed she had sent proof of her attendance to Matthews.

Mother denied using methamphetamine in August of 2020 when she tested positive for it. Mother had been taking medication that resulted in positive tests for benzodiazepine. Mother did not tell Matthews about that medication. Mother was not aware of her positive tests for opioids and morphine on September 8 and 28, and October 5, 2020, and denied using those substances.

Since February 2021, Mother has been "on strike" from drug testing because she was promised things by Matthews regarding reunification that she did not receive. Mother was sorry that she had had stopped drug testing.

Matthews told Mother to "kiss your baby good bye." After September 2020, Mother "cut ties" with Matthews.

In August of 2020, Mother's visits with M.G. were conducted virtually. From August 2020 until April 19, 2021, Mother never got her full nine hours per week of visitation with M.G. During that time period, she saw M.G. in person about five times, and one of those visits, in February 2021, was in Orange County. Mother had one unsupervised visit with M.G. around November 2020, but "then she cut them off." Arrangements were made for a visit with M.G. in Orange County in February 2021, but the visit was canceled due to lack of time confirmation.

23

Issues over transportation to visits with M.G. arose. When Mother told Matthews about the transportation issues, Matthews offered bus passes. Mother asked Williams to set a halfway point for the visits with M.G. The K.'s never paid for Mother's transportation to visit M.G. or gave Mother money for gas. The K.'s did help Mother and Father buy a car, but they repaid the K.'s.

Mother did not agree with the recommendation to terminate reunification services. She wanted her children to remain in her life, she was trying to reunify, and it was hard being away from M.G. and B.G. Mother had raised B.G. and wanted to do the same for M.G. Mother believed she could safely parent B.G. while using drugs. Mother had housing (she was living with Father) and M.G. and B.G. could reside with them. Mother did not give the address to the social worker but testified to it in court.

C. *Father's Testimony*

Father testified as follows:

Father had been enrolled in Western Pacific Medical Clinic's intensive outpatient program since before August 2020 and had never left the program or been terminated from it. There, he participates in in-person, weekly, hour-long individual counseling and relapse prevention. In counseling, he discusses the dependency case and M.G. and B.G., and in relapse prevention discusses his "triggers," which include not having his children and low-esteem. Father has gained tools, such as contacting his sponsor and reading the Alcoholics Anonymous "big book," to deal with his substance abuse triggers. Father had informed Matthews of his participation in these components of the Western Pacific Medical Clinic program.

Father had been taking methadone for about three years and had been prescribed Xanax, a benzodiazepine, about four years earlier. Father began taking methadone after his medications related to surgery got "out of hand." His tolerance rose and he needed more and more pills, which his doctor refused to provide. Father then got on methadone "to control it."

24

With Father's permission, Matthews spoke with Father's treatment providers. When Matthews told Father that his methadone levels should come down, Father responded by saying "[he] felt it was illegal for anybody to practice medicine who wasn't a doctor."

Father was attending Alcoholics Anonymous/Narcotics Anonymous meetings a couple of times per week and had been consistently attending meetings since August 2020. Father was on step four of his 12-step program. He claimed his sobriety date was June 18, 2020. Father's longest period of sobriety was nine years, and had occurred around the middle of 2010 to 2020.

Father admitted that he had tested through the SSA referral only three or four times. He did not test more often because "there's a lot of resistance to [Matthews] and a lot of heartache because of the situation and . . . complexities of the disease in which I suffer from." He was not aware that he had positive tests for methamphetamine on December 10 and 18, 2020 but denied using methamphetamine on those dates.

Father felt uncomfortable providing urine samples under observation, which he believed was excessive and degrading. He told Matthews that he was uncomfortable with observed specimen urinalysis testing, but she did not give him an alternative means of testing. Although Father had asked a previous social worker for a referral for drug patch testing, he did not ask Matthews for one. Although Father did not drug test through the referral from Matthews, he was submitting monthly, random, observed urine tests at Western Pacific Medical Center.

Father was inspired by Mother's participation in Clean Path to find a residential treatment program. He also wanted to "grasp any kind of extra credit or anything [he] could" in order to appease the court. But getting into an inpatient treatment program was difficult, and he learned it was easier to enroll in a detox facility. Around late January or February 2020, Father enrolled in and completed the Roque Center seven-day residential detox treatment program. Father twice completed the Woodglen

25

detox program, which was a seven-day lockdown and administered his methadone medication.

Father enrolled in Twin Town three or four times between August 2020 and the date he testified. That program was conducted over the telephone and video feed due to COVID-19. He never completed the program due to "shortcomings on the behalf of Twin Town Staff and not my own." He was terminated from the program on his first attempt because he had been tardy. After Father enrolled for a second time, Twin Town told him that if he wanted to go to a "detox" he would have to lower his methadone dosage to 25 to 30 milligrams, so it referred him to Hope House, a residential detox program offering a higher level of care. Father was at Hope House in December 2020 but was there for only two days because he was not receiving his methadone medication and began to feel ill. The third enrollment at Twin Town ended because Father missed a telephone call to enroll in Phoenix House. Father missed the call because it came a day earlier than the date Father had in his schedule.

Father was on Phoenix House's waiting list and was scheduled to start the Phoenix House program in a few days. Father was hoping to find social support from a 12-step fellowship and believed the best way to be in a 12-step structure would be in an inpatient program, such as Phoenix House, which would also help him with his isolation issues. He and Mother do not have a good social structure or family close by, as their parents had passed away.

When asked if he had good communication with Matthews, Father answered, "Absolutely not." He blamed the communication problems entirely on Matthews. He claimed that Matthews had never given him referrals for substance abuse or parenting programs, and claimed to have found Twin Town by using Google. He found Woodglen on his own and got into its detox program by calling every morning until a bed became available. Father never asked for a rental car or gas money to visit M.G., and Matthews's testimony to the contrary was not true.

26

Father completed a parenting class, where he learned the importance of communicating with children and acting responsibly in front of them. Father was able to implement what he learned at visits.

Father had only three to five in-person visits with M.G. since August 2020. Although Father had asked for visits in Orange County, the visits were conducted in a park in Rancho Cucamonga, which was supposed to be a halfway point. All visits but one were arranged directly through the K.'s.

In September 2020, Father spoke to Matthews and told her that he and Mother were not receiving their full nine hours of visitation with M.G. Matthews said she would correct the problem with the K.'s. Father sent e-mails to the K.'s to arrange visits with M.G. The K.'s responded to every e-mail with a date and time to meet at a park. From September through December 2020, the K.'s were giving Mother and Father only two to four hours per week due to the K.'s' schedule. Mother and Father were not getting those two to four hours per week because the K.'s canceled visits due to their scheduling issues and social matters. Father said that he or Mother canceled two or three visits with M.G. due to Mother's issues with asthma. Between August 2020 and the date of the hearing, Mother and Father had a total of only two to five visits with M.G. of between two to four hours each.

As of the time of his testimony, visits with M.G. were not taking place. After the last visit with M.G., the only visit that Matthews supervised, Father was very upset with Matthews because M.G. seemed unhappy and uncomfortable when the visit came to an end. At the end of that visit, M.G. started clinging to Father and screamed and cried as though he did not want to go into the car seat. Both parents cried and Matthews tried to assure them he would be ok. Father requested that Matthews permit Mother and Father to arrange visits directly with the K.'s rather than go through Matthews.

27

Father subsequently contacted the K.'s to arrange an in-person visit with M.G. but received no response. Father had several 30-minute visits with M.G. by Zoom, but no in-person visits since March 2021.

Mother and Father were using their full nine hours of visitation with B.G. Visits were conducted in public places such as shopping malls. Visits with B.G. were arranged directly with S.G. Mother and Father had no transportation problems in visiting B.G because he had been placed in Orange County.

Father disagreed with the recommendation to terminate services. He testified: "[T]hose are my kids. They're my life, my everything. You know, once you're a parent . . . it becomes your soul to the [ut]termost part of you. It's everything." Father was willing "to do whatever I have to do to get my kids." As Father anticipated being in Phoenix House, he hoped M.G. and B.G. would live with Mother.

## VIII.  The Juvenile Court's Ruling

The juvenile court found that returning M.G. and B.G. to Mother and Father would create a substantial risk of detriment to M.G.'s and B.G.'s safety, protection or physical or emotional well-being, that SSA had provided reasonable services, and that there was not a substantial probability of returning the children to their parents by the date of the 18-month review hearing.

The court found "[t]he very same issues that brought the case into dependency still exist" and "the parents are still actively using [drugs]." The court disbelieved testimony by Mother and Father that they were no longer using drugs and pointed to positive drug tests that contradicted their testimony and supported the conclusion they both were still using. Father had participated in services at his methadone clinic, but the court concluded he had done so only to get methadone and "did not engage in those same services that the court was ordering as a condition of and part of a case plan." Although, the court recognized, Father had tried to get into programs, he had not completed them, and the reasons he gave for being terminated from the programs

28

were not legitimate. In light of Mother's and Father's unresolved drug addiction, the court found there was no substantial probability of M.G. and B.G. being returned to Mother and Father's custody by the time of the 18-month review.

The court rejected the argument that Matthews had abdicated her responsibility to coordinate visitation. The court found that SSA was still overseeing visitation and allowing Mother and Father to schedule visitation with M.G. directly through the K.'s was of benefit to them.

Accordingly, the juvenile court terminated reunification services and set the section 366.26 hearing for July 20, 2021. The court kept the visitation orders in place and the testing referrals open, and authorized sibling visits once per month.

## DISCUSSION

### I. The Juvenile Court Did Not Err by Terminating Reunification Services

Mother and Father argue the juvenile court erred by finding that SSA had provided them reasonable services during the second reunification period. Both Mother and Father argue that Matthews improperly delegated her duty to arrange visitation to M.G.'s caregivers, the K.'s, with the consequence that Mother and Father did not receive meaningful time with M.G. Father argues that Matthews did little, if anything, to help Father in finding a drug treatment center with a higher level of care that could accommodate his dosage of methadone.

A. *Background Law and Standards of Review*

At a 12-month review hearing, the juvenile court must return a child to parental custody "unless the court finds, by a preponderance of the evidence, that the return of the child . . . would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child." (§ 366.21, subd. (f)(1).) A parent's failure to participate regularly and make substantial progress in court-ordered

treatment programs is prima facie evidence that return of the child to the parent's care would be detrimental. (§ 366.21, subd. (f)(1)(B).)

Except under circumstances not applicable here, reasonable reunification services must be offered when a child is removed. (§ 361.5, subd. (a); *Earl L. v. Superior Court* (2011) 199 Cal.App.4th 1490, 1501.) Whether the reunification services offered were reasonable and suitable is judged according to the circumstances of the particular case. (*Earl L. v. Superior Court*, *supra*, at p. 1501.) The standard is not whether SSA provided the best services that may be provided in an ideal world, but whether the services provided were "reasonable under the circumstances." (*In re Misako R.* (1991) 2 Cal.App.4th 538, 547.) A finding that reasonable reunification services have been offered must be based on clear and convincing evidence. (*Serena M. v. Superior Court* (2020) 52 Cal.App.5th 659, 674.)

The juvenile court's decision to terminate reunification services and set a hearing under section 366.26 is reviewed under the abuse of discretion standard, as is the juvenile court's finding that reasonable services had been provided or offered. (*Katie V. v. Superior Court* (2005) 130 Cal.App.4th 586, 598.) We view the evidence in a light most favorable to the juvenile court's order and draw all reasonable inferences to uphold it. (*In re Mary B.* (2013) 218 Cal.App.4th 1474, 1483; *Christopher D. v. Superior Court* (2012) 210 Cal.App.4th 60, 70.) We defer to the juvenile court's assessment of witness credibility and resolution of conflicts in the evidence. (*In re Cole Y.* (2015) 233 Cal.App.4th 1444, 1453; *In re Maya L.* (2014) 232 Cal.App.4th 81, 104, fn. 6.)

B. *Visitation*

"Reasonable visitation is an essential component of any reunification plan." (*In re M.F.* (2019) 32 Cal.App.5th 1, 16.) Mother and Father were authorized nine hours per week of in-person visitation with M.G. Mother and Father do not argue that nine hours per week was an unreasonable amount but contend they were denied the ability to use the time allotted.

It is not disputed that Mother and Father used but a small portion of their authorized visitation time with M.G. The parties present sharply contrasting reasons for this. Mother and Father place the blame on SSA, in particular, Matthews, and on the K.'s. According to Mother and Father, Matthews improperly delegated to them the authority and responsibility to contact the K.'s directly to arrange visits, and the busy schedule of the K.'s hampered their ability to visit M.G. SSA places the blame on Mother and Father, whose failure to use their visitation time with M.G. was, according to SSA, the result of their inability or refusal to deal with drug addiction and meaningfully participate in services.

Although Mother and Father limit their challenges to services provided during the second reunification period, it is important to start with the first reporting period. The case plan was approved by the juvenile court on February 25, 2020. Father refused to participate in reunification services until sometime in June 2020. Mother was at Clean Path from mid-May to August 15, 2020. During that period of time, the K.'s drove from San Bernardino County to pick up Mother and take her to visits with M.G. and, after the visits, drove Mother back to Clean Path.

Addendum Report #1, dated August 24, 2020, includes the statement that Matthews "will authorize [Mother] and [M.G.]'s caretakers to *continue* to arrange visits." (Italics added.) This statement reveals the decision to give Mother and Father free rein to arrange visits with M.G. directly with the K.'s had been made and followed before the second reunification period began. On August 24, 2020, at the six-month review hearing, the juvenile court found that Mother and Father had received reasonable services. Neither Mother nor Father have ever challenged that finding.

The juvenile court found that Mother and Father benefitted from their ability to schedule visitation with M.G. directly through the K.'s. The record supports that finding. The ability to arrange visitation with M.G. by directly contacting the K.'s gave Mother and Father greater flexibility and reduced the number of communications

31

and approvals. It also allowed Mother and Father to bypass Matthews. Father testified he "[a]bsolutely" did not have good communication with Matthews, and there were periods of time when neither Mother nor Father were communicating with her. When Mother and Father did communicate with Matthews, their e-mail and text messages to her were too often hostile, vulgar, and unproductive. Given Mother and Father's views on their relationship with Matthews, directly contacting the K.'s to arrange visits with M.G. would be advantageous to Mother and Father.

Neither Mother nor Father complained about the direct contact system until March 2021, when Father requested that all arrangements for visitation with M.G. be made by e-mail. Matthews agreed. Father testified that after the visit on March 25, 2021, he asked Matthews that he and Mother be permitted to go back to the system whereby they scheduled visits with M.G. by directly contacting the K.'s. Matthews agreed to that too. Inasmuch as Father wanted to go back to using the direct contact system, Mother and Father must have preferred and benefited from it.

The record supports a finding that Mother and Father's failure to use their visitation time with M.G. was not due to the K.'s schedule. Indeed, Father testified that in the latter part of September 2020, the K.'s responded to each of his e-mail messages regarding visitation with a date and place for the visit. Father testified that the K.'s offered only two to four hours per week of visitation from September through December, 2020. The juvenile court, we may infer, disbelieved that testimony, which would have been the court's prerogative. But if Father's testimony were true, Mother and Father did not even take advantage of the two to four hours per week that Father claimed were offered them.[1] They visited M.G. only three times in August and September, 2020

---

[1] Father testified that he and Mother did not have nine hours of visitation time in September because the K.'s would only give them two to four hours. The record shows that Mother and Father canceled a visit scheduled for September 2, 2020 and were 30 minutes late for visits on September 4 and 25. The K.'s had to cancel a visit on September 11 because at 3:30 p.m. Mother and Father were still in Orange County. The

32

(August 29 and September 4 and 25), once in October 2020 (and also attended a birthday party for B.G. at which M.G. was present), and once in December 2020.

Substantial evidence supports a finding that Mother and Father's limited number of in-person visits with M.G. was not due to the services offered by SSA, the K.'s schedule, or anything Matthews did or did not do. Mother and Father had been granted a great deal of flexibility and freedom in arranging visits with M.G. but did not take advantage of the visitation opportunities offered them. Mother and Father showed up late or canceled a number of visits with M.G., including one scheduled for April 8, 2021, when Father thrashed their hotel room and left in their car. Mother complains that Matthews never tried to coordinate visits at a location halfway between Mother and the K.'s, but Matthews testified that Mother never asked her to do so. Father complained angrily about cancellation of a visit with M.G. scheduled for March 23 or 24, 2021 for failure to provide timely confirmation, but an in-person visit with M.G. was arranged for March 25, and Matthews personally transported M.G. to and from the visit.

Mother complains that the COVID-19 pandemic interfered with visitation. She cites the August 24, 2020 Status Review Report, in which Matthews reported that "visitation between the parents and the boys has been difficult during the COVID-19 pandemic" and visits with M.G. had become "'less frequent.'" Those comments refer to visitation during the first reunification period, Mother never challenged the juvenile court's finding that she was offered reasonable services during that period, and Mother's and Father's writ petitions concern visitation during the second reunification period. Besides, Matthews also reported in the August 24, 2020 Status Review Report that "[o]nce visits could resume, the [K.'s] again volunteered to pick [Mother] up from her center and facilitate visits with her and baby [M.G.]."

_____

K.'s sent Mother and Father a text message on September 19 to inform them they could visit M.G. The K's never heard back from Mother and Father.

33

Throughout these dependency proceedings, Mother and Father have displayed a pattern of blaming others for their misfortunes and shortcomings. Father blamed his failure to complete his first Twin Town program entirely on the Twin Town staff. He blamed communication problems with Matthews entirely on Matthews, and blamed her for his failure to drug test. Mother blamed Matthews for promises that were supposedly made and broken. The juvenile court, as the judge of witness credibility, could reasonably conclude that blaming SSA and the K.'s schedule for the few number of times Mother and Father visited in-person with M.G. was simply part of that pattern of laying blame on others.

Mother and Father suggest, without directly arguing, that SSA did not do enough to help them with transportation to visits with M.G. By finding that SSA had provided reasonable services, the juvenile court impliedly found that SSA had satisfied whatever obligation it might have had to assist Mother and Father with transportation. Substantial evidence supports such an implied finding. In August 2020, Father told Matthews by text message that he had obtained employment as a tattoo artist and bought a new car. When Mother and Father lost use of the car, and Mother told Matthews of transportation struggles, Matthews provided her bus passes and spoke with the K.'s. The K.'s volunteered several times to provide Mother transportation and in December 2020 loaned Mother and Father money to buy a car.

Both Mother and Father make weight of a comment made by Matthews on learning that Mother intended to leave Clean Path on August 15, 2020. Matthews asked Mother to "'brainstorm'" handling transportation to visits with M.G. Mother claims that request was punishment for Mother's decision to leave Clean Path against the advice of her clinical team. It was not punitive or unreasonable to ask Mother to help in coming up with transportation options. Mother had consented to M.G.'s placement outside of Orange County. Mother might have had access to or ideas about transportation that were unknown to Matthews.

34

In sum, substantial evidence supports a finding that Mother and Father were offered reasonable services in regards to their visitation rights with M.G.

C. *Substance Abuse Treatment*

Father argues SSA failed to provide referrals for or assist him in finding a residential treatment program with a higher level of care that would accommodate his methadone regimen. SSA argues that Father forfeited that argument by stipulating to his case plan, which required only outpatient substance abuse treatment, and seeking no appellate relief from it. Father's case plan that was approved at the six-month review hearing required Father to complete an SSA-approved outpatient drug treatment program. The case plan does not mention a residential or inpatient treatment program. Father did not object to that case plan or challenge it by appellate review. By failing to object to the case plan, Father stipulated to its terms (*In re Cody S.* (1994) 31 Cal.App.4th 221, 231), and those terms did not include an inpatient drug abuse treatment program.

Nonetheless, substantial evidence supports a finding that Father was offered reasonable services in regards to substance abuse treatment. Father was provided referrals to alcohol and drug abuse treatment programs in December 2019, and again in May and June 2020. Included was a referral to Twin Town.[2] On June 11, 2020, Father sent Matthews a text message explaining that he had not entered a residential treatment program because most programs would require him to go off methadone or lower his dosage to 30 milligrams Father stated: "Most places want you off, or if you['re] going to get off (which I don't have a problem with) and have a maximum methadone entry dose for detoxing . . . at around 30 mg."

Father enrolled in programs at Twin Town in July, September, and October 2020. Matthews testified that in September 2020, she spoke to a representative of Twin

---

[2] Although Father claimed that he had found Twin Town on his own, SSA reports stated that Father had received referrals for outpatient and inpatient treatment, and Matthews testified that Twin Town was her referral for higher care.

Town, who informed her that Father had been discharged after an initial assessment for nonparticipation. In October 2020, the Matthews spoke with another representative of Twin Town, who confirmed that Father was enrolled and scheduled for an intake assessment. But on October 28, 2020, Matthews was informed that Father had been discharged from Twin Town for noncontact and because he needed a higher level of treatment with medical supervision due to the level of his methadone intake.

Matthews testified that Twin Town was the only referral that SSA provided Father for higher-level care, and Twin Town could not provide Father the level of care he needed due to his methadone regimen. Should SSA have done more to find and refer Father to an inpatient treatment program that would not require him to reduce his methadone intake? The case plan did not require SSA to do more. SSA had provided services beyond those required by the case plan by providing Father referrals for both outpatient and inpatient drug abuse treatment programs. Twin Town was among those referrals, and Father testified that Twin Town referred him to Hope House, a residential detox program offering a higher level of care which offered a higher level of care. Father was at Hope House for only two days because he was not receiving his full methadone treatment and had begun to feel ill.

The root problem is not that SSA failed to offer reasonable services, but that Father refused, up until the last minute, even to try to reduce his methadone intake to a level that would have allowed him to enter a residential treatment program. Father accused Matthews of practicing medicine without a license when she recommended that he reduce his methadone intake, and, on appeal, argues there is no competent medical opinion on whether reducing his methadone intake would have been medically sound. But Matthews, before suggesting that Father reduce his methadone intake, spoke with Father's medical providers. Twin Town advised Father that if he wanted to go to a "detox" program he would have to lower his methadone dosage to 25 to 30 milligrams, so it referred him to Hope House, a residential detox program offering a higher level of care.

36

Father acknowledged that most, if not all, residential treatment programs would require him to reduce his methadone intake to 25 to 30 milligrams per day.

The juvenile court would have been justified in finding that Father used his methadone regimen as an excuse, rather than a legitimate reason, for not pursuing substance abuse treatment. Father ultimately did seek to lower his methadone intake when his back was against the wall and he faced the consequences of his failure to become sober. In March 2021, with the 12-month review hearing looming, Father informed Matthews that he had started a methadone detoxification program. Father testified he was scheduled to enter the Phoenix House program at the conclusion of the 12-month review hearing. We know nothing about Father's success in those programs except that on April 8, 2021, Mother cancelled a visit with M.G. because Father was "on one right now" and had "thrashed their hotel room."

In sum, substantial evidence supports the finding that Father had been offered reasonable substance abuse treatment services.

## II. The Juvenile Court Did Not Err by Declining to Continue Dependency Proceedings

Mother and Father argue the juvenile court erred by declining to continue dependency proceedings services beyond the 12-month statutory limit. They argue there was a substantial probability that M.G. and B.G could be returned to their physical custody by the 18-month point.

Dependency proceedings may be continued beyond 12 months, but to a date no later than 18 months after a child was removed from a parent's physical custody. (§ 366.21, subd. (g)(1).) A juvenile court may continue dependency proceedings only if it finds "there is a substantial probability that the child will be returned to the physical custody of his or her parent or legal guardian and safely maintained in the home within the extended period of time or that reasonable services have not been provided to the parent or legal guardian." (*Ibid*.) "[I]n order to find a substantial probability that the

child will be returned to the physical custody of his or her parent . . . and safely maintained in the home within the extended period of time, the court shall be required to find all of the following:  [¶] (A) That the parent . . . has consistently and regularly contacted and visited with the child.  [¶] (B) That the parent . . . has made significant progress in resolving problems that led to the child's removal from the home.  [¶] (C) The parent . . . has demonstrated the capacity and ability both to complete the objectives of his or her treatment plan and to provide for the child's safety, protection, physical and emotional well-being, and special needs." (§ 366.21, subd. (g)(1)(A)-(C).)

To warrant continuation of a dependency proceeding beyond the 12-month review hearing, "there must exist more than just mere hope additional services will facilitate reunification," and the juvenile court must "essentially determine if the parent has demonstrated sufficient rehabilitation to complete the program plan in the extended time, as well as the ability to once more adequately provide for a child's emotional and physical well-being."  (*A.H. v. Superior Court* (2010) 182 Cal.App.4th 1050, 1060, 1062.)  A finding of "no reasonable probability of return" is reviewed under the substantial evidence standard.  (*Kevin R. v. Superior Court* (2010) 191 Cal.App.4th 676, 681.)

In denying continuation of dependency proceedings, the juvenile court found there was not a substantial probability that M.G. and B.G. could be returned safely to Mother and Father's physical custody by the 18-month milestone.  The detention hearing for both M.G. and B.G. was held on December 20, 2019; therefore, the 18-month period elapsed on about June 20, 2021—just two months after the juvenile court issued its order terminating reunification services.

Substantial evidence supports the juvenile court's finding.  The dependency petition alleged that Mother and Father each had an unresolved substance abuse problem that included the use of methamphetamine and heroin, and both had a history of not being forthcoming about their substance abuse.  Substance abuse treatment and drug testing

38

were core components of their case plans, and the ability to maintain sobriety was an overarching goal.

Mother had completed several components of her case plan, including parenting classes and therapy, and had completed drug treatment at Clean Path. But the critical consideration is progress toward meeting the objectives of the case plan, not mere technical compliance with it. (Cf. *Georgeanne G. v. Superior Court* (2020) 53 Cal.App.5th 856, 867.) Despite such technical compliance with much of her case plan, Mother had not resolved the issue that had brought her into the dependency system: As the juvenile court found, Mother was still using drugs.

Mother had positive tests for methamphetamine on August 21 and December 11, 2020 and positive tests for morphine and opiates on September 8 and 28, and October 5, 2020. She did not appear for tests on December 28 and 29, 2020, and January 6, 21, and 29, and February 1, 3, 9, and 18, 2021 and those missed tests must be counted as positive tests. (*In re Kadence P.* (2015) 241 Cal.App.4th 1376, 1384.) After January 28, 2021, she stopped calling in for drug testing. Mother never provided proof of attendance at Alcoholics Anonymous/Narcotics Anonymous meetings. Mother testified she not used methamphetamines, was unaware of the positive tests opiates, and had given Matthews proof of attendance at Alcoholics Anonymous/Narcotics Anonymous meetings. The juvenile court did not believe her and concluded that she continued to actively use drugs. Mother's lack of commitment to sobriety is shown by her testimony that she could safely "parent" B.G. while using drugs.

In light of Mother's history, and her inability after 12 months of services to stop abusing drugs, it would have been mere hope that by continuing services for another two months Mother would have achieved sobriety and been ready and able to safely maintain M.G. and B.G. in her home.

Father too had not resolved the drug abuse problem that had brought him into the dependency system. Father never complied with the drug testing component of

39

his case plan. Father did not appear for any required tests from December 2019 to December 2020. From December 1, 2020 to January 22, 2021, Father's call-in compliance rate was 40 percent, and he failed to appear for six tests out of eight required tests. Along with Mother, he ceased calling-in for drug testing as of January 28, 2021. Father tested positive for methamphetamine and benzodiazepine on December 10 and 18, 2020. Father also failed to provide proof of participation in a 12-step program.

Father drug tested in July 2020, September 2020, and October 2020 for his three enrollments at Twin Town. He had several positive tests for methamphetamine. Father enrolled in treatment programs but, as the juvenile court found, he never completed them, and the reasons Father gave for leaving or being terminated from treatment were not legitimate. Father went through several detox programs, but, as his drug testing history shows, none worked. Father recognized that his treatment options were limited due to his methadone regimen, yet was unwilling even to try to reduce his methadone intake until the very last minute. On April 8, 2021, Mother reported that Father "is 'on one' right now," had thrashed their hotel room, and poured lighter fluid on Mother's clothing.

In light of Father's history, and inability after 12 months of services to stop abusing drugs, it would have been mere hope that by continuing services for another two months Father would have achieved sobriety and been ready and able to safely maintain M.G. and B.G. in his home. Although Father testified that he anticipated entering the Phoenix House treatment program within a few days, the juvenile court was entitled to disbelieve Father, or find that Father's participation in that program, as in the prior programs, would end unsuccessfully.

### III. Father Did Not Ask the Juvenile Court for a Continuance Under Section 352.

Father argues the juvenile court should have invoked section 352 to extend family reunification services past the 12-month time limit. Section 352 provides: "Upon

40

request of counsel for the parent, . . . the court may continue any hearing under this chapter beyond the time limit within which the hearing is otherwise required to be held, provided that a continuance shall not be granted that is contrary to the interest of the minor." (§ 352, subd. (a)(1).) "Notwithstanding the[] statutory limits on reunification services, a juvenile court may invoke section 352 to extend family reunification services beyond these limits if there are 'extraordinary circumstances which militate[] in favor of' such an extension." (*In re D.N.* (2020) 56 Cal.App.5th 741, 762.)

To obtain a continuance under section 352, written notice must be given at least two court days before the date set for the hearing, and notice must be accompanied by affidavits and declarations setting forth specific facts showing that a continuance is necessary. (§ 352, subd. (a)(3).) Father did not seek a continuance of the 12-month review hearing: He filed neither written notice nor declarations in support.

A continuance of the 12-month review hearing would not have been justified in any case. Father contends a continuance was justified because SSA failed to offer him reasonable services and the COVID-19 pandemic interfered with his ability to have in-person visits with M.G. We have concluded SSA offered Father reasonable services. Father reported that, due to COVID-19, many residential treatment programs were closed for intake but that was during the first reunification period. During the second reunification period, COVID-19 did not prevent Father from entering a residential treatment program.

Likewise, COVID-19 interfered with in-person visitation during the first reunification period, but not during the second reunification period. During the second reunification period, Father had the ability to have in-person visitation with M.G. There was a brief period in late December 2020 and early January 2021 in which in-person visits with M.G. were interrupted due to COVID-19; however, the 12-month review hearing was held 16 months after M.G. was detained, so Father had four extra months to make up for the missed visits.

## DISPOSITION

Mother's petition for writ of mandate and Father's petition for writ of mandate are denied. The requests for a stay are denied. In the interest of justice, this decision shall become final as to this court five days from the date it is filed. (Cal. Rules of Court, rule 8.490(b)(2)(A).)


FYBEL, J.

WE CONCUR:


O'LEARY, P. J.


BEDSWORTH, J.